**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMGEN, INC., <br><br> Plaintiff, <br><br> v. <br><br> SANDOZ INC., et al., <br><br> Defendants. | Civil Action No. 18-11026 (MAS) (DEA) <br> (consolidated) <br><br> **MEMORANDUM OPINION** <br> **FILED UNDER SEAL** |

**SHIPP, District Judge**

This matter comes before the Court upon Plaintiff Amgen, Inc.'s ("Amgen") and Defendants Cipla Ltd., Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories, Ltd., Sandoz Inc., MSN Laboratories Private Ltd., Pharmascience, Inc., and Zydus Pharmaceuticals (USA), Inc.'s ("Zydus") (collectively, "Defendants") *in limine* and *Daubert* motions. (ECF Nos. 351, 353-54, 359-61, 363.) The Court has carefully considered the parties' corresponding opposition briefs (ECF Nos. 368-69, 372-76), and decides the matter without oral argument pursuant to Local Civil Rule 78.1. The Court makes the following determinations with respect to the motions.

**I.   BACKGROUND**

This Hatch-Waxman patent litigation concerns the validity, enforceability, and alleged infringement of United States Patent Nos. 7,893,101 ("the '101 Patent"), 8,093,283 ("the '283 Patent"), 8,455,536 ("the '536 Patent"), 10,092,541 ("the '541 Patent"), and 7,427,638 ("the '638 Patent") (collectively, the "Patents"). The Patents are alleged to cover Amgen's Otezla[®] (apremilast), a drug that treats plaque psoriasis and psoriatic arthritis.

## II. LEGAL STANDARD

A motion *in limine* is designed to narrow evidentiary issues for trial and to eliminate unnecessary interruptions during trial. *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990). "An *in limine* motion is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to support a particular claim or defense, because that is the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards." *Bowers v. NCAA*, 563 F. Supp. 2d 508, 532 (D.N.J. 2008) (internal quotation marks omitted).

"[Federal Rule of Evidence 402] provides the baseline for determining the admissibility of evidence in the federal courts." *In re Nautilus Motor Tanker Co.*, 85 F.3d 105, 112 (3d Cir.1996) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 585-87 (1993)). Under Federal Rule of Evidence 402, "[r]elevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 402. "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

"Under the Federal Rules of Evidence, a trial judge acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (internal quotation marks and citation omitted).

> As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is "sufficiently

2

>tied to the facts of the case," so that it "fits" the dispute and will
>assist the trier of fact.

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (citing *Daubert*, 509 U.S. at 591). "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704.

"In order for expert testimony to meet *Daubert*'s reliability standard, it must be based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017) (citation omitted). "[A]dmissibility is not based on whether an expert's opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *UGI Sunbury*, 949 F.3d at 834 (internal quotation marks and citation omitted). Rather, "the court looks to whether the expert's testimony is supported by 'good grounds.'" *Id.* The "inquiry envisioned by [Federal] Rule [of Evidence] 702 is . . . a flexible one," *Daubert*, 590 U.S. at 594-95, and courts "retain 'latitude' to decide 'how' to apply [the rule's] requirements in a bench trial," *UGI Sunbury*, 949 F.3d at 833 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Under the Federal Rules of Civil Procedure, "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). "Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report . . . [that] must contain: . . . a complete statement of all opinions the witness will express and the basis and reasons for them . . . ." Fed. R. Civ. P. 26(a)(2)(B)(i). Furthermore, a party who has responded to a request for production "must supplement . . . its . . . response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process

or in writing." Fed. R. Civ. P. 26(e)(1)(A). "If a party fails to provide information or identify a witness as required by [Federal] Rule [of Civil Procedure] 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

## III. AMGEN'S MOTIONS

### A. Motion *in Limine* to Preclude Defendants' Expert Witness, Dr. Elaine Gilmore, from Offering any Opinions about Material Incorporated from the Reports of other Experts (ECF No. 363)

Pursuant to Federal Rule of Evidence 702 and *Daubert*, Amgen moves to preclude Defendants' expert witness, Dr. Elaine Gilmore, from offering opinions outside of her expertise. (ECF No. 363.) Amgen does not challenge Dr. Gilmore's expertise as a dermatologist. (*See generally* Amgen's Gilmore Moving Br. 1, ECF No. 364.) Instead, Amgen notes that Dr. Gilmore's report incorporated by reference the entirety of five other expert reports served by Defendants' other expert witnesses. According to Amgen, Defendants' other expert witnesses opined on non-dermatological topics such as rheumatology, pharmacology, chemistry, and crystallography. (*Id.* at 3-5.) Amgen argues that "Dr. Gilmore's wholesale incorporation of material from several expert reports leaves open the possibility that she could attempt to offer opinions in those reports as her own." (*Id.* at 5.) Amgen maintains that unless its motion is granted, "Dr. Gilmore would be free to testify about each of these areas." (*Id.* at 3.)

Notwithstanding these arguments, at this time, the Court declines to grant Amgen's motion. As Defendants note, "Amgen has not pointed to a single instance where Dr. Gilmore has attempted to opine on solely stereochemistry, pharmacology, or crystallography issues." (Defs.' Opp'n Br. to Gilmore Mot. 1, ECF No. 368.) Furthermore, based on the record before the Court, it does not appear that Defendants intend to elicit testimony from Dr. Gilmore on non-dermatological topics. (*See id.* at 2 ("Nowhere in her report or in her deposition did Dr. Gilmore ever claim to be offering

4

opinions in the areas of stereochemistry, crystallography, or pharmacology.").) Moreover, as Defendants also note, Dr. Gilmore's report repeatedly avers that she is not an expert in the fields from which she is drawing information, and that she is relying on other expert conclusions rather than opining. (*See, e.g.*, Gilmore Opening Report ¶ 28 n.6, Ex. A to Abraham's Decl., ECF No. 368-2 ("To be clear, I am not offering an opinion on the invalidity of the limitations related to the stereomeric purity and crystalline forms of apremilast, but rely solely on Dr. Gribble's, Dr. Steed's, and Dr. Sacchetti's opinions regarding these limitations.").) It is well-established that "[i]n forming an opinion, experts may rely on other experts' opinions[.]" *Raritan Baykeeper, Inc. v. NL Indus.*, No. 09-4117, 2017 WL 3568401, at *7 (D.N.J. Aug. 16, 2017).

In the absence of any suggestion in the record that Defendants intend to elicit testimony from Dr. Gilmore on non-dermatological topics, the Court declines to issue an order limiting her testimony to dermatological topics. Although the Court declines to grant Amgen's motion at this time, the Court will entertain objections to Dr. Gilmore's testimony at trial in the event Amgen believes Dr. Gilmore's testimony strays beyond her expertise.

**B.    Motion *in Limine* to Exclude Dr. Gordon Gribble's European Patent Law Testimony (ECF No. 361)**

Pursuant to Rule 702 and *Daubert*, Amgen also moves "to exclude the opinions of Defendants' chemistry expert Dr. Gordon Gribble, insofar as they concern Celgene's patent attorney's legal statements made to the European Patent Office ("EPO") in connection with the prosecution of the European patent application leading to the grant of EP 1 752 148 B1 ('EP '148')." (Amgen's Gribble Moving Br. 1, ECF No. 362.)[1] According to Amgen, Dr. Gribble's November 2020 expert report interprets certain statements made by Celgene to the EPO. (*Id.*)

---

[1] The Court previously found that "Amgen is the transferee of Celgene's entire interest in the patents-in-suit." (ECF No. 195.)

5

Amgen represents that Dr. Gribble's expert report found that "Celgene's statements [to the EPO] regarding the disclosure of optical purity in the counterpart to the '358 patent support [his] opinion that the '358 patent discloses and anticipates the stereomerically pure claim limitations" and that "the prosecution history of EP '148 demonstrates that Celgene understood the '358 Patent to disclose stereomerically pure [apremilast]." (*Id.* at 2, 5 (emphasis omitted) (quoting Gribble Report ¶ 237, Ex. 1 to May Decl., ECF No. 362-1).) Amgen maintains, to the extent Dr. Gribble supported his opinion based on Celgene's statements to the EPO, Dr. Gribble's opinion was at least partially "based on an incorrect understanding of European patent law," a topic on which he is unqualified to opine. (*Id.*)

For their part, Defendants argue that Dr. Gribble's expert report "present[s] only scientific opinions on the scope and content of the prior art, and simply point[s] to statements by the patentee that confirm his understanding." (Defs.' Gribble Opp'n 1, ECF No. 369.) According to Defendants' description of Dr. Gribble's report, "[w]hen investigating the patentee's own characterization of the '358 patent's disclosures, Dr. Gribble found that Celgene (Amgen's predecessor-in-interest for the '638 patent) provided the European patent office with the same understanding of the '358 patent that he offered." (*Id.* at 2.) Defendants maintain that Gribble's report only opines on "scientific content" and certain "factual disclosures of a prior art reference" in Celgene's communications with the EPO regarding EP '148. (*Id.* at 3.)

Having considered the parties' arguments, at this juncture, the Court is inclined to hear Dr. Gribble's testimony and reserve ruling on these arguments until after trial. It is true that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *UGI Sunbury LLC*, 949 F.3d at 833 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). Nevertheless,

6

"district courts do retain latitude to decide how to apply those requirements in a bench trial." *Id.* (citations omitted). In the context of a bench trial, such latitude includes authority to "conditionally admit the expert testimony subject to a later Rule 702 determination." *Id.* "This is not to say that the Court may rule on the merits of this matter based on fundamentally flawed testimony, only that the Court will defer its ultimate decision on whether this testimony and evidence is admissible under Rule 702 until after that testimony is taken at trial" and determine the admissibility of Dr. Gribble's testimony with the benefit and context of a full trial record. *Perez v. First Bankers Trust Servs, Inc.*, No. 12-4450, 2015 WL 5722843, at *3 (D.N.J. Sept. 29, 2015).

## IV.  DEFENDANTS' MOTIONS

### A.  Defendants' Motion *in Limine* to Preclude the Testimony of Plaintiff's Expert Mr. Mercer and to Strike His Expert Report (ECF No. 360)

To rebut Dr. Gribble's opinions on Celgene's comments to European patent officials regarding EP '148, Amgen seeks to introduce evidence from Christopher Mercer, a former European patent attorney. (Defs.' Mercer Moving Br. 1, ECF No. 360-1.) Amgen represents to the Court that "Mr. Mercer's testimony is offered to rebut Dr. Gribble's unqualified opinions about the meaning and importance of Celgene's statements under European law." (Amgen's Mercer Opp'n Br. 6-7, ECF No. 372.) According to Amgen, "Mr. Mercer is the witness who can explain the law underlying the Celgene statements Dr. Gribble relies on, and who can show that Dr. Gribble's opinions rest on a misinterpretation of European patent law." (*Id.* at 9.) Amgen asserts that when "[v]iewed in the context of the legal framework within which the statements were made, the inference Defendants and Dr. Gribble seek to have the Court draw from Celgene's statements to the EPO—a concession of an enabling disclosure in the '358 patent and thus anticipation under U.S. law—does not follow from what Celgene told the EPO." (*Id.* at 3.) For their part, Defendants assert that their experts have only "pointed to statements made in the EP '148 file history as a party

7

admission regarding the information set forth in a central piece of prior art in this case" and do not raise disputes about European law requiring Mr. Mercer's expertise. (Defs.' Mercer Moving Br. 1.)

Although a close question, at this point, similar to Dr. Gribble's expert testimony, the Court is inclined to hear Mr. Mercer's testimony and reserve judgment on its relevance and admissibility. The Court is not convinced that Dr. Gribble's opinion raises questions of European patent law, as opposed to a question about whether Celgene made certain admissions of scientific fact to the EPO. Nevertheless, out of an abundance of caution, the Court will reserve judgment on the admissibility of Mr. Mercer's testimony until after trial, at which point the Court can review Mr. Mercer's testimony in light of the full trial record.

**B. Zydus's Motion to Preclude Testimony by Dr. Fabia Gozzo and Dr. Allan Myerson regarding New Opinions on Infringement (ECF No. 359)**

Defendant Zydus moves to exclude portions of Dr. Fabia Gozzo's and Dr. Allan Myerson's expert testimony for alleged violation of Local Patent Rule 3.1, Federal Rule of Civil Procedure 26(a)(2), and the Court's Scheduling Order (ECF No. 296). (Zydus's Moving Br. 3, ECF No. 359.)

**1. Background**

The specific litigation between Amgen and Zydus concerns the alleged infringement of the '101 Patent. Claims 1 and 15 of the '101 Patent are directed to the crystalline Form B of apremilast having X-ray Powder Diffraction ("XRPD") peaks at 10.1, 13.5, 20.7, and 26.9 degrees 2Θ. (*See* Amgen's Zydus Opp'n Br. 1-2, ECF No. 374.)

On April 29, 2019, Amgen disclosed its infringement theories in its operative infringement contentions. (*Id.* at 5.) Amgen contended that Zydus's ANDA Product literally infringes claims 1 and 15 of the '101 Patent and that expert testing of Zydus's active pharmaceutical ingredient

8

("API") and apremilast tablets will demonstrate infringement. (Pls.' Infringement Contentions Ex. C at p. 3, Ex. A McCormick Decl., ECF No. 359-3.) The contentions asserted that XRPD testing "is expected to confirm that the crystalline Form B in Zydus's ANDA Product has an X-ray powder diffraction pattern comprising peaks at about 10.1, 13.5, 20.7, and 26.9 degrees 2Θ." (*Id.* at p. 6.)

### 2. Dr. Gozzo's Report and Deposition

One of Amgen's experts, Dr. Gozzo, conducted synchrotron XRPD testing on samples of Zydus's API while also testing a reference sample of Form A apremilast. (Dr. Fabia Gozzo's Expert Report ¶¶ 14-15, Ex. B to McCormick Decl., ECF No. 359-4.) Dr. Gozzo submitted her opening expert report in November 2020, but she did not offer any opinion regarding which form of apremilast she detected in the samples or whether infringement of the '101 patent had occurred. (Gozzo's Expert Report ¶ 16.) In a second round of expert reports, Zydus's expert, Dr. Steven Miller, served a non-infringement report analyzing Dr. Gozzo's data and concluded that Form F apremilast could have generated some of the peaks. (*See* Amgen's Zydus Opp'n Br. 2.)

At Dr. Gozzo's deposition, Zydus's counsel asked Dr. Gozzo whether the XRPD diffractogram generated by Zydus's API demonstrated consistency with a diffractogram generated by a Form A reference standard. (Gozzo Dep. 69:9-12, Ex. D to McCormick Decl., ECF No 359-6.) After repeated questioning about the Form A reference standard, Dr. Gozzo opined that some features of Zydus's API were not consistent with Form A, but more consistent with Form B. (Gozzo Dep. 83:1-89:5.)

Local Patent Rule 3.1 and Federal Rule of Civil Procedure 26(a)(2) require the disclosure of infringement contentions early in litigation. Infringement contentions, however, need not actually prove infringement, but must only "outline a plaintiff's theories of infringement." *AntiCancer, Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1331 (Fed. Cir. 2014). Zydus claims that Dr.

Gozzo's analysis of her own test results constitutes a "new theory" not present in her expert report. Mem. Op. 16, *Boehringer Ingelheim Pharms., Inc. v. Aurobindo Pharma USA, Inc.*, No. 17-cv-07887, ECF No. 495 (D.N.J. Sept. 22, 2020) ("*Boehringer*"). Amgen, however, argues that Dr. Gozzo simply commented on expert testing and analysis, which is not a required disclosure in the infringement contentions themselves. *See AntiCancer*, 769 F.3d at 1331.

Zydus relies on *Howmedica* and *EagleView* to analogize Dr. Gozzo's statement to other cases involving untimely-disclosed infringement theories, but Dr. Gozzo's deposition lacks the legal nature or surprise of these disclosures. *See Howmedica Osteonics Corp. v. Depuy Orthopaedics, Inc.*, No. 11-6498, 2014 WL 6675923, at *4-6 (D.N.J. Nov. 24, 2014) (precluding Plaintiff from asserting a doctrine of equivalents infringement theory when Plaintiff's initial infringement contentions included only a literal infringement theory), *aff'd sub nom. Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312 (Fed. Cir. 2016); *EagleView Techs., Inc. v. Xactware Sols., Inc.*, 485 F. Supp. 3d 505, 529 (D.N.J. 2020) (precluding a non-infringement argument based on metadata when the non-infringement contentions and expert reports failed to disclose that metadata was a basis for non-infringement). Unlike the litigants in these cases, here Amgen previously disclosed the parameters of its infringement contentions, including that it would conduct XRPD testing and that diffractogram peaks might demonstrate infringement of Form B apremilast. (Pls.' Infringement Contentions Ex. C, at pp. 3, 6.)

Furthermore, the Court finds the District of Delaware's position in *Cephalon* persuasive when considering the instant motion. *Cephalon, Inc. v. Watson Pharms., Inc.*, 769 F. Supp. 2d 761, 772 n.13 (D. Del. 2011). There, the defendant moved to strike the testimony of plaintiff's expert. *Id.* The expert's report contained purely technical information, but plaintiff elicited the expert's infringement opinions during a deposition. *Id.* The court denied defendant's motion to

strike. The Court found that because defendant could have used the expert's deposition testimony for impeachment purposes at trial, the court should also allow the plaintiff-proponent of the expert opinion to also use the elicited deposition testimony at trial. *Id.*; *see also Shire LLC v. Amneal Pharms., LLC*, No. 11-3781, 2013 WL 1932927, at *15 n.8 (D.N.J. May 7, 2013) ("[P]ermitting undisclosed expert testimony from a deposition . . . prevent[s] the injustice of the testimony being used as a shield by an opposing party but not a sword by the party it's offered against, or vice versa.").

Here, Zydus's deposition testimony similarly "opened the door" for Dr. Gozzo to testify on what apremilast forms the API sample contained. *Cephalon*, 769 F. Supp. 2d at 772 n.13. Zydus's counsel repeatedly asked Dr. Gozzo whether specific peaks in the diffractogram demonstrated the presence of Form A, and she responded that some peaks more accurately reflect the presence of Form B. (Gozzo Dep. 88:7-14.) Accordingly, consistent with *Cephalon*, the Court will consider testimony from Dr. Gozzo along these lines in order to prevent the injustice of enabling expert opinion first disclosed at a deposition from being used by Defendants as impeachment material, but not also by Amgen to prove its case.

### 3. Dr. Myerson's Report and Deposition

Dr. Myerson's expert report analyzes Dr. Gozzo's data on Zydus's API sample in comparison with diffractograms generated from reference standards of Form A and Form B apremilast. (Dr. Myerson's Expert Report ¶¶ 1-2, 72, 88, Ex. C to McCormick Decl., ECF No. 359-5.) Dr. Myerson indicated that he detected Form B peaks in Zydus's API and ANDA Product at 10.1, 13.5, 20.7, and 26.9 degrees 2Θ, thus infringing upon the '101 patent, in his opinion. (*Id.* ¶¶ 226-54.) In his rebuttal report, Zydus's expert, Dr. Miller, countered that instead of Form B,

11

Form F may have caused some of the peaks in Zydus's sample API. (Amgen's Zydus Opp'n Br. 2 (citation omitted).)

Zydus's counsel questioned Dr. Myerson about Dr. Miller's theories during his deposition. Dr. Myerson opined that Form F could not have generated certain peaks in the diffractogram, some of which could only be caused by Form B. (Myerson Dep. 72:3-73:20, Ex. E to McCormick Decl., ECF No. 359-7.) It appears that this deposition testimony was consistent with his expert report, in which he had previously identified the same peaks as being generated by Form B. (*See* Myerson's Expert Report ¶ 99 ("The similarity between the two XRPD patterns as a whole further supports my opinions that the discussed reference peaks were generated by crystalline Form B of apremilast as claimed by the Asserted Claims of the '101 Patent[.]").) Dr. Myerson specifically explained that he only addressed Form F in his deposition in response to Dr. Miller's rebuttal report. (Myerson Dep. 75:6-76:5.)

Dr. Myerson's deposition does not appear to add any new opinions beyond those contained in his existing expert report. His testimony—that peaks in Zydus's API demonstrate the presence of Form B apremilast—matches his expert report, and his discussion of Form F was in direct response to Dr. Miller's rebuttal and Zydus's direct questioning. Accordingly, because Dr. Myerson's analysis presents no new infringement "theory," the Court will allow his testimony on infringement analysis covered in his deposition.

4. ***Pennypack* Factors with Regard to Zydus's Motions to Preclude Testimony**

Even assuming Drs. Gozzo and Myerson's challenged deposition testimony was untimely or otherwise improperly disclosed expert opinion, the Court finds that the *Pennypack* factors do not require the opinions' exclusion. The Third Circuit instructs courts to consider the following

factors, known as the *Pennypack* factors,[2] when considering whether to exclude untimely or otherwise improperly disclosed expert opinions: (1) prejudice or surprise to the party against whom the excluded witness would have testified; (2) ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case; (4) any bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the excluded evidence. *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977) (citations omitted). "The importance of the evidence is often the most significant factor." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012).

The challenged deposition testimony from Dr. Gozzo and Dr. Myerson hardly prejudices Zydus. Both experts relied on data already in their opening expert reports when giving their depositions, and Zydus has not specifically demonstrated how the testimony's consideration by the Court prejudices it. Zydus already knew such XRPD testing would occur based on Amgen's infringement contentions. (Pls.' Infringement Contentions Ex. C, at p. 6.) In addition, while Dr. Gozzo opined that her XRPD testing demonstrates the presence of Form B, Zydus already knew of this exact argument because Dr. Myerson already evinced this opinion in his expert report. (Myerson's Expert Report ¶ 99.) Thus, Zydus faced no genuine surprise from this deposition testimony. To the extent Zydus faces any prejudice whatsoever, it cannot "cure" the prejudice through another rebuttal by Dr. Miller because such an additional rebuttal would be based on the same underlying data already analyzed. The testimonies provide little disruption to the case as a whole, and there is no indication of bad faith by Amgen. Finally, Amgen claims Dr. Gozzo's and Dr. Myerson's opinions are the only direct evidence of Zydus's infringement of the '101 patent.

---

[2] "Regional circuit law governs our review of the district court's decisions whether to admit expert testimony[.]" *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

13

(*See* Pls.' Opp'n Br. 10.) Unlike the expert opinions in *Sowell v. Butcher & Singer*, which was only potentially important to determining damages, Amgen here relies fully on these expert opinions for its claim of literal infringement of the '101 patent. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 302 (3d Cir. 1991).

To the extent Amgen's expert opinion was only initially disclosed at the depositions of Dr. Gozzo and Dr. Myerson, or otherwise occurred at the end of the expert discovery, the *Pennypack* factors support permitting expert testimony at trial along these lines. The Court will, however, entertain objections at trial, to the extent Defendants believe the expert witnesses' testimony diverges from opinions disclosed in their reports and depositions.

**C.  Motion *in Limine* to Preclude the Testimony of Amgen's Expert William F. Smith and to Strike His Expert Report (ECF No. 351)**

William F. Smith is a former Administrative Patent Judge of the PTO. (Ex. B to Defs.' Smith Br. 3, ECF No. 351-3.) Defendants seek to exclude his testimony as to (1) the governing law regarding obviousness-type double patenting and whether differences between the '638 and '101 patents and the reference patents are due to gamesmanship; (2) whether the patent examiner correctly issued restriction requirements and allowances, what inferences should be drawn from the examiner's decisions, and what would have happened had the examiner issued different decisions; and (3) the general practices, policies, and procedures of the USPTO with regards to certain statutory patent term adjustments and an overview of the prosecution histories of the patents at issue here. (Defs.' Smith Br. 1-2, ECF No. 351-6.) The Court addresses each of these arguments below.

In general, courts have held that the testimony of a patent law expert "'may include information regarding patent prosecution procedures and policies and practices followed by the PTO.'" *Boehringer* at 9 (quoting *Pharmacia Corp. v. Par Pharm., Inc.*, No. 01-6011, 2004 WL

5614917, at *2 (D.N.J. Feb. 18, 2004)). Here, the Court will allow Mr. Smith to opine on the PTO's general policies, practices, procedures, and the facts underlying the prosecution histories of the '638 and '101 patents. *See id.* at 9-10. Such testimony may assist the Court in understanding the PTO's practices and procedures, as well as the facts underlying Defendants' obviousness-type double patenting argument.

Courts have, however, precluded experts from opining on the governing law, reaching legal conclusions, or applying law to the facts of the case in which the expert testifies. *See id.* at 10 (citing *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d. Cir. 2006)). Legal questions are for the Court, and the Court will disregard any such opinions from Mr. Smith. *See id.* at 11; *see also Eli Lilly & Co. v. Actavis Elizabeth LLC*, No. 07-3770, 2010 WL 1931233, at *11 (D.N.J. May 7, 2010). Amgen represents that it will not seek to elicit from Mr. Smith any opinions on the governing law of obviousness-type double patenting, nor will it offer any legal conclusions as to whether obviousness-type double patenting applies in this case. (Amgen's Smith Opp'n Br. 10-11, ECF No. 376.) Insofar as Mr. Smith offers any opinions of this nature, they would be inappropriate, and the Court would disregard them. *See Boehringer* at 11; *Eli Lilly*, 2010 WL 193123, at *11.

Patent experts are also prohibited from opining on "the appropriateness of the patent [e]xaminer's rejections and allowances, and how a reasonable patent examiner would have acted based on technical facts," unless the proffered expert "has the technical expertise necessary to provide these opinions." *See Boehringer* at 11 (citing *Pharmacia*, 2004 WL 5614917, at *2 ("courts will not permit an expert to testify regarding what a patent examiner would have done unless the expert is experienced in the technology at issue.")). Defendants challenge Mr. Smith's testimony to the extent he intends to opine on what they consider to be "technical" questions, such

15

as "whether the Examiner correctly issued restriction requirements and allowances, what inferences should be drawn from the Examiner's decisions, and what would have happened had the Examiner issued different decisions." (Defs.' Smith Br. 8.) Both Amgen and Defendants agree that Mr. Smith does not have the relevant qualifications to offer technical opinions on the patents at issue, although Amgen denies that it intends to offer any such testimony. (Defs.' Smith Br. 8; Amgen's Smith Opp'n Br. 12.) Nevertheless, consistent with the Court's treatment of Dr. Gribble's expert report, *supra*, the Court will reserve judgment on whether Mr. Smith's testimony touches on "technical issues" beyond his training and experience.

### D. *Motion in Limine* to Preclude Testimony of Amgen's Experts Dr. Ronald A. Thisted and Dr. Andrew F. Alexis (ECF No. 353)

Defendants also move to preclude Amgen's experts Dr. Ronald A. Thisted, a biostatistician, and Dr. Andrew F. Alexis, a dermatologist, from testifying at trial and to strike their reports. Amgen represents to the Court that it "intends to offer the testimony of Dr. Thisted and Dr. Alexis to rebut Defendants' *prima facie* case on obviousness." (Amgen's Thisted and Alexis Opp'n Br. at 5, ECF No. 373.) On the contrary, however, Defendants argue that Drs. Alexis and Thisted's reports "'rebut' none of Defendants' experts and relate solely to an issue—unexpected results as objective indicia of non-obviousness of [the '541 Patent]—that Amgen was required to raise in its opening round of expert reports but failed to do so." (Defs.' Thisted and Alexis Moving Br. 1, ECF No. 353-13.) Moreover, Defendants maintain that Amgen previously agreed it would not assert a theory regarding objective indicia of non-obviousness. (*Id.* ("Amgen told Defendants it 'will not assert that objective indicia are probative of non-obviousness for the '541 and '854 patents.'" (quoting Jan. 4, 2021 Email Correspondence, Ex. A to Abraham Decl., ECF No. 353-2)).) Defendants argue that Alexis and Thisted's opinions "relate solely to . . . unexpected results as objective indicia of non-obviousness" of the '541 patent. (Defs.' Thisted and Alexis

16

Moving Br. 1, ECF No. 353-13.) For its part, Amgen does not dispute that it previously informed Defendants it would not assert a theory regarding objective indicia of non-obviousness. Rather, Amgen asserts that at the same time it disclaimed theories of objective indicia of non-obviousness, it "also informed Defendants that 'Amgen in no way limits its ability to rely on any evidence to support validity arguments other than objective indicia.'" (Amgen Thisted and Alexis Opp'n Br. 3 (quoting Jan. 4, 2021 Email Correspondence).) Amgen maintains that having received reports from Defendants' experts Drs. Helfgott and Gilmore regarding the alleged *prima facie* obviousness of the '541 Patent, (*id.* at 1), it believes that it is entitled to rebut Defendants' reports in this regard, even if Defendants "have reimagined the evidence as objective indicia, a theory Amgen has repeatedly told Defendants it will not advance at trial with respect to the '541 patent." (*Id.* at 5.)

The Court will hold the parties to their prior agreement regarding expert testimony on unexpected results as objective indicia of non-obviousness as to the '541 patent. Having confirmed in January 2021 that it would not assert this theory, and having failed to disclose an expert report on this topic in the opening round of expert disclosures, Amgen may not go back on its word without prejudicing Defendants who would otherwise not be able to produce rebuttal evidence on this theory. *See Astrazeneca LP v. Breath Ltd.*, 2014 WL 4798477, at *3-4 (D.N.J. Sept. 26, 2014) (listing factors district courts must consider when deciding whether to exclude untimely disclosed expert opinion including "the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified" and any "willfulness in failing to comply with the court's order" (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012))). Nevertheless, the Court will consider Drs. Alexis and Thisted's opinions to the extent they seek to rebut Defendants' *prima facie* obviousness case. As Amgen notes, Defendants do not appear to argue that the challenged opinions are not responsive to portions of Defendants' *prima facie* obviousness case.

17

To the extent Defendants intend to present evidence from Drs. Gilmore and Helfgott's reports on this topic, Amgen is entitled to offer rebuttal evidence.

Defendants also argue that Dr. Thisted's report is not a proper rebuttal and his opinions should not be considered by the Court because his report (1) is not labeled as a rebuttal report, (2) does not purport to respond to any of Defendants' experts, and (3) Dr. Thisted did not review Defendants' expert reports before preparing his own. (Defs.' Thisted Moving Br. at 5-6.) Although Dr. Thisted's report does not directly rebut specific claims by Defendants' experts, Dr. Thisted's report does attempt to rebut Defendants' experts by providing statistical evidence that would contradict the assertion that the dosing schedule could be arrived upon through "routine optimization" or "simple trial and error." (Amgen's Thisted and Alexis Opp'n Br. 5-6.) An expert rebuttal report is proper if it will "explain, repel, counteract, or disprove the evidence of the adverse party." *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (quoting *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974)); *see also Withrow v. Spears*, 967 F. Supp. 2d 982, 1001-02 (D. Del. 2013) (holding that a rebuttal report is proper if its intent is to contradict or rebut evidence on the same subject matter identified by opposing party's expert). Moreover, Dr. Thisted's report addresses Defendants' experts' opinions because it provides the statistical analysis on which Dr. Alexis's rebuttal opinions relied. Whether or not Dr. Thisted reviewed or considered Defendants' expert reports in forming his opinions, the Court finds that Thisted's report is proper rebuttal evidence because it is put forward to counteract and disprove Defendants' evidence. This is especially true where his statistical analysis was relied upon by Dr. Alexis and Dr. Alexis will be permitted to offer his own rebuttal testimony.

### E. *Daubert* Motion to Exclude Certain Testimony of Amgen's Expert Dr. Ronald A. Thisted (ECF No. 354)

Defendants seek to exclude certain testimony of Dr. Thisted pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert*. (*See generally* Defs.' Thisted Moving Br., ECF No. 354-4.) Specifically, Defendants argue that parts of Dr. Thisted's testimony is unreliable and outside of his area of expertise. (*Id.* at 5.)

In a bench trial, "it is not necessary to apply the *Daubert* standard with full force in advance of trial." *Perez v. First Bankers Tr. Servs., Inc.*, No. 12-4450, 2015 WL 5722843, at *2 (D.N.J. Sept. 29, 2015) (quoting *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 405 (E.D. Pa. 2007)). Rather, the court may "allow testimony provisionally and revise its view once the testimony is taken." *Id.*; *see also In re Depomed Pat. Litig.*, No. 13-04507, 2016 WL 743374, at *2 (D.N.J. Feb. 22, 2016) (quoting *Warner Chilcott Lab'ys Ir. Ltd v. Impax Lab'ys, Inc.*, No. 09-01233, 2012 WL 1551709, at *23 (D.N.J. Apr. 30, 2012)) ("[A] district court conducting a bench trial may admit evidence . . . subject to the understanding that the court may later exclude or disregard it if it turns out not to meet the standards for reliability and relevancy . . . ."). Here, the Court will defer its ruling on whether Dr. Thisted's testimony is admissible under Rule 702 until after this testimony is taken at trial.

### V. CONCLUSION

For the foregoing reasons, the parties' motions *in limine* are denied. The Court will enter an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE